## Case No. 4,114.
### DUDLEY'S CASE.

[1 Pa. Law J. 302; 1 Pa. Law J. Rep. 96.]

Circuit Court, E. D. Pennsylvania. Oct. 31, 1842.

INVOLUNTARY BANKRUPTCY — PROPERTY NOT DIVESTED UNTIL DECREE PASSED—EXECUTION—INJUNCTION TO STATE COURT—JURISDICTION.

1. The court, in this case, confirm the decision of Ex parte Bennet [Case No. 1,309].

2. The property of a petitioner in bankruptcy is not divested out of him till a decree of bankruptcy has passed. Hence, till the decree has passed, the petitioner's property remains subject to execution.

[Applied in Sullivan v. Hieskill. Case No. 13,-594; Ex parte Freedley, Id. 5,079.]

3. In this case, the court examine the broad question, whether in any case, the district court of the United States has power to issue an injunction to stay the process of state courts, and expresses an opinion that the district court has no such power.

In a former case, Judge Randall decided that the property of a petitioner in bankruptcy, was divested out of him, only from the time of the decree of bankruptcy;[1] and accordingly, allowed an execution creditor who had made a levy after the petition had been filed, but before a decree had passed, to proceed with a sale of the property levied on. In a subsequent case the question was again brought before the court. Dudley filed a petition on the 29th of August last; but before a decree could by the terms of the act be obtained, several executions had issued against him; and on the 9th of September, he applied to the district court for an injunction on the plaintiffs in the several judgments[2] to stay proceedings thereon, and

---

[1] Bankrupt Act 1841, § 111 [5 Stat. 442]. And be it further enacted, That all the property, &c., of the bankrupt, &c., who shall by a decree of this court, be declared to be a bankrupt within this act, shall by mere operation of law, ipso facto, from the time of such decree, be deemed to be divested out of such bankrupt, &c., &c., and shall be vested by force of the same decree, in such assignee as from time to time shall be appointed, &c.

[2] The petition for an injunction made mention only of executions from justices of the peace; but there were in fact other executions from the courts; and the application was considered as for an injunction to creditors generally.

for the appointment of a receiver. Judge Randall, said that he saw no reason to change the opinion which he had expressed in Bennet's Case, and accordingly refused to grant the injunction.

At the request of counsel, the facts were then certified to the circuit court for decision; and the case was heard before BALDWIN, Circuit Justice, and RANDALL, District Judge.

Mr. Reed and Mr. Hopkins, for Dudley, submitted the case, merely requesting the attention of the court, to the case Ex parte Foster, decided some time since by Judge Story [Case No. 4,960]; a case which, it is said, was "argued at very great length by the several counsel and especially by Mr. Rand," and which is regarded by the Suffolk bar, "as entirely conclusive on the points which it embraces." That case was directly in point. It decided that the district court had power to issue an injunction to stay state process; that the decree related to the filing of the petition; and finally, that the "liens" protected by the second section of the act, were those alone where either the property or possession of the thing, passed to the creditor.[3]

Mr. Hirst and Mr. Waln, for the execution creditors.

The general creditors, contend, (however they may disguise the principle, by asserting a doctrine of relation back) that the property of a bankrupt is divested out of the bankrupt from the time of filing his petition. The question must be decided by the act of congress itself. The third section provides, that as the property, &c., of every bankrupt, &c., who shall by a decree, &c., be declared a bankrupt, shall by mere operation of law, &c., from the time of such decree be deemed to be divested out of such bankrupt, &c., and the same shall be vested by force of the same decree, in such assignee, &c. Where language is so clear, no room is left for construction. This language, clearly makes the decree the process by which the property is divested. It would be contrary to the spirit of all legislation thus to permit a debtor to hinder, delay, and baffle his creditors. It has been decided that the petitioner may withdraw his petition at pleasure. He could not do this, if his property had vested in his creditors. He could not annul an act which passed his estate to creditors, without their consent. Then, how could his property pass to an assignee not in existence? or more properly, pass out of the bankrupt, into nobody. Such a construction would present the anomaly of property without any owner. If it were stolen or taken by a trespasser, would it not be laid as the bankrupt's property? He might die,—and then would it not pass to his administrator or executor? In 3 Penn. Dig. p. 531, Judge Dickerson recognizes the doctrine of Ben-

---

[3] [See note at end of case.]

net's Case. It is said that Judge Story in Foster's Case has held the contrary. The process in that case was mesne process; and it is clear that Judge Story did not intend to decide the point now in issue; or if he did he has overruled himself, for he held in Ex parte Randall [Case No. 11,550], decided in the same court, that a bankrupt may withdraw his petition, before decree, without the consent of his creditors, upon the express ground that no property had passed by the filing of the petition.

After the argument on this point, Judge BALDWIN suggested that the district court, had not, in any case, power to issue injunctions to stay the process of state courts, and referred to some of the acts of congress. The court said that they were willing to hear an argument on that point. On a subsequent day Mr. Reed referred again to the Case of Foster, and the comprehensive language of the act, and Mr. Hirst replied, taking some of the grounds which are so well presented in the opinion of the court as delivered by Mr. Justice BALDWIN. (Curia advis. vult.)

BALDWIN, Circuit Justice. Two points are involved in the motion pending in the district court, and adjourned for decision here. Both points will therefore be considered. The question which has been presented on the first argument, arises on the last proviso in the second, and the first clause in the third section of the act of 1841. That proviso is in these words: "Provided also, that nothing in this act contained, shall be construed to annul, destroy, or impair any lawful rights of married women or minors, or any liens, mortgages, or other securities on property real or personal, which may be valid by the laws of the states respectively, and which are not inconsistent with the provisions of the second and fifth sections of this act." A proviso operates as a limitation to the enacting part of a law, or as an exception of some case which might otherwise be embraced by it. This proviso extends to the whole bankrupt law in the plainest terms, and is most emphatic in its language, expressly excluding any construction of any part of the act, which shall annul, destroy, or impair any lien, mortgage or other security on real or personal property, which is valid by the law of the state where it is situated or found, and is not inconsistent with the second and fifth sections.

The phraseology of this proviso is peculiar, and adopted only in cases where the legislature intend that the court shall give no construction to a law, which shall in any manner affect its provisions, or defeat their declared intention. In ordinary acts of legislation, their effects are prospective in defining some rule of action, leaving it to the court to expound and apply it according to the settled judicial rules of construing statutes; it is only where they mean to be the sole expounders of their laws, that a legislature use the language, "nothing in this act shall be so construed," and where it is used, it operates on the past, the present, and the future. Thus, under the third article of the constitution of the United States, the federal courts assumed jurisdiction of suits against a state by a citizen of another state. The 11th amendment declared that "the judicial power of the United States shall not be construed to extend to any suit" of that description, and the supreme court of the United States decided, that it annulled all jurisdiction of such cases then pending, and they were summarily stricken from their docket. [Hollingsworth v. Virginia] 3 Dall. [3 U. S.] 378. As the constitution created the judicial power of the United States, and could control and annul its exercise by a declaration that it should not be exercised on the forbidden case, even after the court had acted on it for years, so congress may act on the judicial power which they create, and by a subsequent law take from the courts a power which they have assumed. In this case, however, the principle need not be carried to the same extent, for the restraint on the judicial power in bankruptcy, is imposed in the same act which brought it into existence, and this prohibition being clearly within the power of congress, is directed to the courts who are to carry the act into effect, as a rule of judicial action to which they must conform. This proviso may be viewed also as a declaration, that there is no provision in the bankrupt act which has the effect which it shall not be so construed as to have; otherwise there is a manifest absurdity in prohibiting a construction, which would be consonant with the intent of the legislature. So viewed,—in this double aspect of a limitation to the power of all courts, and a declaration of the meaning of the whole law,—this court is bounded in its power to make any order or decision in any manner contrary thereto. It cannot so construe the law, as to impair a valid lien or security.

In deciding what is a valid lien or security on property, this proviso refers us to the law of this state, by which we are to ascertain whether a judgment creditor has a lien or security on the real estate of the defendant in virtue of his judgment, or on his personalty by the delivery of an execution to the sheriff, or to a constable who makes a levy on it; and whether if such lien or security existed, it has become afterwards invalid or inoperative. If the result of this inquiry is favourable to the judgment creditor, the only remaining one is, whether any lien or security which he has obtained by the laws of this state, is invalid by reason of being repugnant to the second or fifth sections of the act; if that inquiry ends in the same result, there is an end to the exercise of any judicial power to impair the efficacy of such lien or security; we are forbidden to so construe the law. As this proviso applies to the whole law, it must be carried into the third section, the

substance of which is, that the property of the bankrupt is divested out of him by operation of law from the time of the decree, without any other act, and vests by force of the decree in the assignee appointed by the court. No words are used which indicate in the least degree, that it was intended that the decree should relate to the petition, or have any retrospective operation on the property of the bankrupt which had been, before the filing of the petition, sold or incumbered by any of his acts which was valid by the law of the state, and not invalid by provision of the bankrupt act. It would be a conclusive objection to such relation, that the law had fixed on the decree as the solemn and definite act, which divested the property of the bankrupt and vested it in the assignee; for by giving such decree a relation to the petition. it would in effect divest the property at a time, and by an act wholly different from that which the law prescribes; thus making the court the real and efficient legislator on the property and rights of purchasers and creditors who had lawful liens before the decree. The words of the third section justify no such construction, and if they could be so construed, it would be in the very teeth of that proviso in the second section which expressly prohibits it.

It would be indeed an anomalous principle to incorporate into a system of bankruptcy, that a debtor by his voluntary act of filing a petition, which he could revoke or withdraw at his pleasure at any time before a decree, should be allowed to have the option to proceed to a decree which should annul the valid liens of his creditors by relation to an act which did not bind himself; or by withdrawing his petition, leave himself free to file a new one or waive all benefit of the act. Another conclusive reason against such relation of the decree to the petition, appears by a comparison of the third section of the act of 1841, with the tenth section of the bankrupt act of 1800 [2 Stat. 19].

"That the assignment or assignments of the commissioners of the bankrupt's estate and effects as aforesaid, made as aforesaid, shall be good at law or in equity, against the bankrupt; and all persons claiming by, from, or under, such bankrupt. by any act done at the time, or after he shall have committed the act of bankruptcy upon which the commission issued: provided always that in case of a bona fide purchase, made before the issuing of the commission from or under such bankrupt, for a valuable consideration, by any person having no knowledge, information, or notice, of any act of bankruptcy committed, such purchase shall not be invalidated or impeached." Now it must be by some new and strange rule of construing laws, that where one, by express words declares that the commissioner's assignment, shall operate by relation to the act of bankruptcy, against all persons claiming under the bankrupt subsequently, except bona fide purchasers before the commission, for valuable consideration, without notice, and the other declares, in equally express terms, that the decree shall operate from the time it is rendered, it shall yet have its effect by relation to the filing of a petition. This construction becomes the more startling, when it is considered that the third section of the act of '41, contains no exception or proviso in favour of bona fide purchasers after the petition and before the decree, whereas the tenth section of the act of 1800, by a proviso declared, that a bona fide purchase after the act of bankruptcy and before the commission, "should not be invalidated or impeached." It must then come to this, that if the decree divests the bankrupt of his property, and vests it in the assignee by relation from the filing the petition, and the law contains no exception of a bona fide purchase without notice, it is consequently cancelled and invalidated by the decree, unless the judicial legislation which interpolates the doctrine of relation into this third section, shall also legislate a proviso to their first legislation. so that the new bankrupt law shall not operate on an innocent purchaser, with a degree of severity which no court could inflict upon him by any authority under the old one of 1800. Taking the third section as it reads, no proviso for the protection of purchasers was necessary, but the enacting clause of the tenth section of the act of 1800, expressly cut out all purchases whatever under the bankrupt after the act of bankruptcy; a proviso was therefore necessary to protect the fairest. To suppose congress ignorant of the provisions of the old act, or to have given the same effect in the new by provisions wholly dissimilar, would be an imputation on their capacity or disposition to act wisely or justly. The same conclusions follow from a comparison of the two acts in relation to liens.

The proviso to the tenth section of the act of 1800, protected purchasers only, but the sixty-third section contained a proviso covering the whole law in these words: "That nothing contained in this act, shall be taken or construed to invalidate or impair any lien existing at the date of this act, upon the lands or chattels of any person who may become a bankrupt." 1 Story, Laws, 750. By the thirty-first section it is enacted: "That in the distribution of the bankrupt's effects, there shall be paid to every of the creditors a portion rate. according to the amount of their respective debts, so that every creditor having security for his debt by judgment, statute, recognizance, or specialty, or having an attachment under any of the laws of the individual states, or of the United States, on the estate of such bankrupt, (provided, there be no execution executed upon any of the real or personal estate of such bankrupt, before the time he or she became bankrupts) shall not be relieved upon any such judgment, statute, recognizance. specialty, or attachment, for more than a rate-

able part of his debt, with the other creditors of the bankrupt."

An execution executed is thus protected by the proviso in this section, if done before the time the party became a bankrupt, so that the execution creditor so protected, would recover his whole debt out of the property under execution; and by the sixty-third section, every lien existing at the passage of the law, of whatever nature, was excepted from the operation of any of its provisions. But in the third section of the act of 1841, there is not one word on the subject of liens, and this significant silence is conclusive of the intention of the legislature, to leave them under the protection of the proviso in the second section; whereas if the doctrine of relation is applied, an execution executed by a levy, and even a sale of personal property, between the petition and decree, has no protection whatever, though in such case the protection was complete under the act of 1800. If this was the intention of congress, it is unaccountable that they did not (as in the act of 1800) declare that the decree should so operate: it is equally so, that they should have inserted the proviso to the second section, if liens existing at the time were intended not to be protected, but annulled, and the proviso made senseless, as it becomes a dead letter by giving the decree a relation; for it cannot be pretended that it can relate to a lien created after the decree of bankruptcy, when the bankrupt can have no property to bind by it. Independent of these reasons against this doctrine of relation, is the injustice of its operation. It was always deemed an odious and severe feature in the act of 1800; and the old system of bankruptcy in England has been modified by their late act; and it is strange that any attempt should be made here to restore ancient rigour by a construction of a law which was intended to abolish it, and expresses that intention. in language, which to this court is unequivocal in its meaning and imperative in its effects.

We now come to the question, whether the plaintiff in the judgment and execution exhibited to us, has a lien or security on the property of the petitioner, by the laws of this state. No objection has been made to these proceedings, on the ground of their want of conformity to the provisions of any act of assembly, or the decisions of the supreme court of the state. Those which have been made, are founded on the decisions of other courts in other districts, in cases arising under the bankrupt act of 1841, and on some late opinions in the house of lords, in England.[4] So far as any decisions of co-ordinate courts in other circuits are founded on the local law of the states in which they sit, they

are entitled to every weight which is due to the judgment of the distinguished judges who administer the jurisprudence of a state as the courts of the states do, and we take them as judicial evidence of the local law, not to be questioned by us. So far as any decision of the house of lords in England, has declared what is at the time the common law of the country, we have no right nor disposition to gainsay it; but sitting here to administer the law of Pennsylvania, we cannot look beyond it or through it to any court which does not profess to be guided by it. Nor can we at this time of day recognize as authority, any adjudication elsewhere which contravenes the established principles of the jurisprudence of this state, as declared by its supreme court and that of the United States: we must take the common law as it existed at the time of its adoption, first by usage and afterwards by act of assembly, whereby it has the force of a statute, and is changeable only by statute. Disclaiming any right or power to improve, to amend the law, or to make it what it ought to be, we leave that to another department of the government, and follow the more humble path which leads us to the knowledge of what it is, what it has been, and what it must be declared to be, till the legislative power shall make it otherwise.

In considering the effect of a judgment on the real, and an execution on the personal property of the defendant, it has struck us with no little astonishment, that a doubt could be entertained as to the law of this state; and there is no little cause of alarm for the security of property and the rights of creditors, if it is now open to argument, whether they have a lien or security on the estate of their debtors by judgment, by execution, or by a levy, while the property is in his hands. In a common case it would be deemed sufficient to declare that a judgment is a lien on real estate from the time of its rendition, without an execution or levy during five years; that an execution was a lien on personal property from its delivery to the sheriff till its return, without a levy, and that by a levy the property of the defendant was divested, and vested in the sheriff. To even refer to decisions on the subject, or to go into any reasoning, would have been deemed as unnecessary as dangerous, lest it might be supposed that the law remained to be now settled by this court. But as the authority of the supreme court of the United States has been invoked in a late decision in another circuit (Ex parte Foster, supra)[5] in favour of the doctrine that a judgment is no lien till an execution is issued and a levy made, we cannot decline the inquiry whether that court has so declared the law, or given any opinion which can countenance a doctrine so utterly subversive of the fixed rules of property. The opinions of the supreme court in Thelluson v.

---

[4] Cited in Ex parte Foster, supra. [Atlas Bank v. Nahant Bank, 23 Pick. 488: Lickbarrow v. Mason. 6 East, 21, 25. note; Hammonds v. Barclay, 2 East, 227, 235; Giles v. Grover. 6 Bligh (N. S.) 279.]

[5] [See note at end of case.]

Smith, 2 Wheat. [15 U. S.] 423, and in Conard v. Atlantic Ins. Co., 1 Pet. [26 U. S.] 442, are supposed to sanction the principle contended for by the petitioner in this case; but so far from doing this, they recognize the existence of a lien on land by a judgment without execution, and the divestiture of the personal property of the defendant by a levy on a fi. fa.

The case of Thelluson v. Smith was a suit by a judgment creditor against the marshal to recover the proceeds of a sale of the real estate of a defendant who was a debtor to the United States on duty bonds on which the United States proceeded to judgment, execution, and sale, after the judgment of the plaintiff who had taken out no execution, he claiming the proceeds of the sale in virtue of his prior lien, the United States claiming under the 65th section of the collection law of 1799, which gave them a preference in case of the insolvency of the defendant, as was the case before the court.

In Conard v. Atlantic Ins. Co. the controversy was, whether the company could recover damages against Conard, the marshal, who had sold the goods of a debtor of the United States for duty bonds under execution issued by them, the plaintiff claiming the goods in virtue of respondentia bonds and an assignment of the bill of lading. Thelluson v. Smith bore on the case only collaterally; it depended not on the law of Pennsylvania, on the nature of the lien of a judgment, presenting the question whether the preference of the United States accruing after the judgment would cut it out, the court held that it did on the words of the act of 1799, which they quoted and then remarked, "These expressions are as general as any which could have been used, and exclude all debts due to individuals, whatever may be their dignity. The law makes no exception in favour of judgment creditors, and no reason has been shown, or we think can be shown, to warrant the court in making one." [Thelluson v. Smith] 2 Wheat. [15 U. S.] 425. Any reasoning of the court in Conard v. Atlantic Ins. Co. could therefore relate only to the effect of the judgment on the preference of the United States accruing afterwards, and not on its effect on the debtor or private creditors who had subsequent liens; the case turned on the construction of the act of congress, not on the law of Pennsylvania, and was decided exclusively on the former. It was admitted that the judgment was a lien on the real estate, but the court held that the action could not be maintained by the judgment creditor on the ground of his having a more general lien, without a levy on the land sold. The court considered that the case "may have been decided without touching the general question of lien." They say, "the plaintiffs were entitled to recover only upon the ground that they could establish in themselves a rightful title to the proceeds." [Conard v. Atlantic Ins. Co.] 1 Pet. [26 U. S.] 442. "The fact that a judg-

ment creditor has a lien, does not place him in a better situation as a creditor over the general funds of the debtor in the hands of the assignee. If he possess such a lien, he must enforce it in the manner prescribed by law, and if he does, that may so far affect the interest of the assignees actually subjected to such lien. But it gives him no right to the fund until he has perfected his lien according to the course of the law. Until that period, he has merely a power over the property, but not an actual interest in it." "The real ground of the decision was, that the judgment creditor had never perfected his title by any execution beyond the Sedgeley estate; that he had acquired no title to the proceeds as his property, and that if the proceeds were to be deemed the general funds of the debtor, the priority of the United States had attached against all other creditors, and that a mere potential lien on land did not convey a legal title to the proceeds of a sale made under an adverse execution. This is the manner in which this case (Thelluson v. Smith) has been understood by the judges who concurred in the decision; and it is obvious, that it established no such proposition, as, that a specified and perfected lien, can be displaced by the mere priority of the United States, since that priority is not of itself equivalent to a lien." [Greenleaf v. Queen] 1 Pet. [26 U. S.] 144.

Thus considered neither of these opinions militates with the existence of a valid lien by a judgment without a levy, as against all persons other than the United States, claiming under the priority acts of 1797 [1 Stat. 515, § 5] and 1799 [1 Stat. 676, § 65]; and even in such cases it is settled that, "This preference is in the appropriation of the debtor's estate; so that if before it has attached, the debtor has conveyed or mortgaged his property, or it has been transferred in the ordinary course of business, neither is overreached by the statute; and it has never been decided that it affects any lien general or specific, existing when the event took place which gave the United States a claim of priority. Brent v. Bank of Washington, 10 Pet. [35 U. S.] 611, 612. In Prince v. Bartlett, the United States claimed a priority over a creditor who had attached the personal property of a debtor of the United States on duty bonds, by the process of attachment authorized by the law of Massachusetts, and it was held by the supreme court, that "the property in question being in possession of the sheriff by virtue of legal process before the issuing of the writ on behalf of the United States, was bound to satisfy the debt for which it was taken; and the rights of the individual creditors thus acquired, could not be defeated by the process on the part of the United States, subsequently issued." 8 Cranch [12 U. S.] 434. The same principle has been applied to attachment in Maryland. Beaston v. Farmers' Bank of Delaware, 12 Pet. [37 U. S.] 135, 136.

These principles must be adopted in the construction of the 5th section of the bank-

rupt act of 1841 [5 Stat. 441], which provides that all creditors who have proved their debts, &c., "shall be entitled to share in the bankrupt's property and effects, pro rata without any priority or preference whatsoever, except only for debts due by such bankrupt to the United States, and for all debts due by lien to persons who by the laws of the United States have a preference in consequence of having paid monies as his securities, which shall be first paid out of the assets," &c. It will not be pretended that this preference of debts due the United States in case of the bankruptcy of their debtor, can be given in cases where they had no preference under the acts of 1797 or 1799, in a case of insolvency. By the act of 1799, the security who pays a duty bond is put in the place of the United States as to a preference: the act of 1841 puts them on the same footing as the United States: the surety can have no preference where the United States had none, nor can the United States have a preference which is not devolved on the surety by the payment of the preferred debt. It follows that the security is the same under the last as the former laws. The distribution is of the bankrupt's or insolvent's property; not of that which he had sold, mortgaged, transferred in the course of business; on which there was a lien general or specific, or an attachment under the local law; or where by a seizure under a fi. fa. the property is divested out of the debtor before the priority occurred. And if the United States have no priority in such cases over the individual purchaser, mortgagee or creditor, it equally follows, that no right can accrue to the assignee, by a decree in bankruptcy.

In their opinion in Thelluson v. Smith, the court say: "The United States are to be first satisfied, but then it must be out of the debtor's estate. If therefore before the right of preference has accrued to the United States, the debtor has made a bona fide conveyance of his estate to a third person, or has mortgaged the same to secure a debt, or if his property has been seized under a fi. fa. the property is divested out of the debtor, and cannot be made liable to the United States. A judgment gives to the judgment creditor a lien on the debtor's lands, and a preference over all subsequent judgment creditors. But the act of congress defeats this preference in favour of the United States, in the cases specified in the 65th section of the act of 1799." [Thelluson v. Smith] 2 Wheat. [15 U. S.] 426. In reviewing this opinion in [Conard v. Atlantic Ins. Co.] 1 Pet. [26 U. S.] 442–444, the supreme court assert the existence of the lien by a judgment, but deny that it gives "a right to property in the land itself, but only a right to levy on the same to the exclusion of other adverse interests subsequent to the judgment, and when the levy is actually made on the same, the title of the creditor for this purpose, relates back to the time of the judgment, so as to cut out intermediate incumbrances." Id. 441. It must consequently cut out a preference accruing afterwards. Without stopping to inquire whether by the law of Pennsylvania, a levy is necessary to consummate the lien of a judgment, it is clear that neither of these opinions denies the existence of a lien by a judgment alone; they go no further than to say, that the priority of the United States to the proceeds of the land sold, by an adverse execution, will attach, if no levy has been made on the judgment, leaving the question involved in the case untouched, as levies have been made before the decree. The language of the court is to be referred to the case before them, and the one under review, and when so referred their opinions in both cases are decisive of the present, for if a levy before the insolvency of their debtor will deprive the United States of their priority by divesting the debtor of his property, a fortiori it will prevent the right of the assignee from attaching by relation to the petition, so as to prevent the creditor of the benefit of his levy.

That the supreme court did not intend in Conard v. Atlantic Ins. Co., to deny the right of a judgment creditor, to enforce his lien against all persons and save the United States in virtue of the priority acts by a levy and sale which would consummate his title, is evident not only from the opinion delivered, but from their opinion delivered at the preceding term in Rankin v. Scott, 12 Wheat. [25 U. S.] 179, in which they say, "The principle is believed to be universal, that a prior lien gives a prior claim, which is entitled to prior satisfaction out of the subject it binds, unless the lien be intrinsically defective, or be displaced by some act of the party holding it, which shall postpone him in a court of law or equity to a subsequent claimant. The single circumstance of not proceeding on it until a subsequent lien has been obtained and carried into execution, has never been considered as such an act. The implied lien created by the second judgment, so long as an elegit can issue on the first. A statutory lien is as binding as a mortgage, and has the force and capacity to hold the lands so long as the statute preserves it in force." "In the case at bar, the judgment is notice to the purchaser, of the prior lien, and there is no act of the legislature to protect the purchaser from that lien." [Rankin v. Scott] 12 Wheat. [25 U. S.] 180.

How far the case of Thelluson v. Smith, is overruled on general principles by this, and on the priority of the United States, by subsequent cases, need not now be examined; it suffices for this case to say, that the opinion of the court in Rankin v. Scott, has never been questioned since, and is conclusive on this motion in regard to the effect of a lien by judgment on real property. As to personal property the law is equally well settled, and was thus laid down in this court in Thompson v. Phillips [Case No. 13,974]: "A fieri facias is plenary authority to sell chattels:

a levy under it gives the sheriff a property in them. in virtue of which he may, and is obliged to sell. 1 Salk. 323; 6 Mod. 293; [Zane v. Cowperthwaite] 1 Dall. [1 U. S.] 313; 11 Serg. & R. 304; Barnes v. Billington [Case No. 1,015]; [Wayman v. Southard] 10 Wheat. [23 U. S.] 45; after the levy his property in the goods continues, though the fieri facias is returned he may sell, the court may order him to bring the money into court: issue a distringas or venditioni exponas to compel him to sell, he becomes liable for the money by the levy, if he has made a sufficient one, the goods are his own. and he may sell when he pleases, unless otherwise ordered by the court. 5 Binn. 208, 273; [Wayman v. Southard] 10 Wheat. [23 U. S.] 45; 17 Serg. & R. 438; 2 Saund. 343, 344; 2 Ld. Raym. 1074. When he begins the execution of a fieri facias, he must complete it; his authority continues though he is out of office. 2 Bac. Abr. 366; 4 Day, Com. Dig. 234; 1 Salk. 12, 318, 323; 1 Lil. Reg. 767, 824. A distringas or venditioni gives no new authority to sell, it is merely compulsory process (1 Ves. Sr. 196; 4 Day, Com. Dig. 236; Shep. Abr. 547; 6 Mod. 295; [Zane v. Cowperthwaite] 1 Dall. [1 U. S.] 313) to execute a power resulting from the fieri facias. and the right of property by the levy. As the levy is the operative act, it must be made by an actual seizure of the goods, in whole, or in part in name of the whole; the sheriff may seize them by force (16 Johns. 288), take, and hold possession; the lien on them attaches when the writ comes to his hands till the return day, without a levy, but if no levy is made before it is past, the lien is lost, and the goods may be taken by a purchaser, or on a subsequent writ (2 Serg. & R. 157)."

Being well satisfied that such was the common law of England at the time of its adoption in this state, and that it is now the settled law of property, we deem it unnecessary to inquire whether these principles are the local law in other circuits, or have been repudiated by any decisions in England; and feeling safety in following the supreme court of this state in their exposition of its own laws, and that of the United States in their adjudication on the general principles of jurisprudence. we can have no doubt that the judgments and executions before us constituted valid liens on the property of the defendants, by the laws of this state. and are protected by them as unquestioned and sacred rights.

Our next inquiry is, whether these liens are inconsistent with any of the provisions of the second or fifth sections of the bankrupt act. It is not pretended that these liens are embraced in any part of the enacting clauses of the second section, nor can any be made in this stage of the proceeding under the fifth section: if any matter should arise before the time for distribution, to which any provisions of this section might apply, it would then be proper to examine it; but we cannot see how it can have any effect on the present motion, or on the creditors who have not proved their debts or claimed any thing under or in virtue of the bankruptcy, but claim a priority to it. We are therefore clearly of opinion, that the motion of the petitioner must be denied on the ground, that his real estate was bound by the judgments, and that his personal property was divested by the levies, whereby nothing remains on which the bankrupt law can operate, so as to impair the rights of the creditors who oppose the motion. But if the case was otherwise, we are well satisfied that the district court could not grant the injunction asked for by any authority under the judiciary, or the bankrupt act. The granting an injunction in any case is the exercise of the highest powers of a court of equity, never done in a doubtful case, or where it is not necessary for the purposes of justice which are not otherwise attainable. No case can occur where so much caution would be necessary as in interfering with the proceedings of the courts of a state, if an authority was given by express words in the law, but on a review of the whole legislation of congress on the subject, it is our opinion, that the power does not exist, and that its exercise is positively prohibited.

The judiciary act gave the district court no jurisdiction in cases in equity. The eleventh section conferred it on the circuit court. The fourteenth section gave to all the courts of the United States power to issue certain writs, and all others "not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law." A writ of injunction in an appropriate case in equity, could consequently issue from the circuit court, as it was within the jurisdiction of the court, necessary for its proper exercise, and consistent with the established principles of courts of equity; but the district court could issue none, because they had no jurisdiction of such cases, nor could a judge of the supreme court do it in vacation, till the act of 1793 which enacted, "that writs of injunction may be granted by any judge of the supreme court, in cases where they might be granted by the supreme or a circuit court," but with this restriction—"Nor shall a writ of injunction be granted to stay proceedings in any court of a state; nor shall such writ be granted in any case without reasonable notice to the adverse party or his attorney, of the time and place of moving for the same." Albers v. Whitney [Case No. 137]. Thus the law stood till the following act was passed in 1807. "An act to extend the power of granting writs of injunctions to the judges of the district courts of the United States. § 1. Be it enacted, &c. that from and after the passing of this act, the judges of the district courts of the United States shall have as full power to grant writs of injunctions, to

operate within their respective districts, in all cases which may come before the circuit courts within their respective districts, as is now exercised by any of the judges of the supreme court of the United States, under the same rules, regulations, and restrictions, as are prescribed by the several acts of congress establishing the judiciary of the United States, any law to the contrary notwithstanding: provided, that the same shall not, unless so ordered by the circuit court, continue longer than to the circuit court next ensuing; nor shall an injunction be issued by a district judge in any case where a party has had a reasonable time to apply to the circuit court for the writ."

The power conferred by this act is on the district judge in vacation, and not on the district court in the exercise of its appropriate jurisdiction, which is not enlarged by this act: it must be in a case in equity in the circuit court and is granted by the district judge to effectuate its jurisdiction and as a part thereof, as is evident from the proviso, limiting its continuance to the next circuit court, and to a case where the party had not had a reasonable time to apply to that court for the writ. Thus restricted, it is most clear that the power of a district judge or court cannot enjoin state process, by any authority of law previous to the bankrupt act of 1841. The bankrupt act of 1800 gave no such power, and the present act is wholly silent on the subject, giving no color for its exercise, but on the contrary, carefully excluding it by the cautious and well defined terms of the sixth section, which specify the jurisdiction of the district court.

1. It extends to "all matters and proceedings in bankruptcy"—under this or any future act of bankruptcy—to be "exercised summarily in the nature of summary proceedings in equity;" but this does not make a matter or proceeding in bankruptcy a suit in equity, or confer any jurisdiction on any subject not pointed out in the act, as a part of the process in bankruptcy, from its inception to its close. In referring to proceedings in equity, it is to the forms and modes adopted by courts of equity in the exercise of their jurisdiction, as contradistinguished from those of the common law; a new jurisdiction is created, to be exercised by a court with limited and special powers, from whose final orders or decrees no appeal or writ of error is given; a court sui generis—the mere creature of the bankrupt act, with features unknown to our general courts, to whose action only one rule is presented, that it shall be summary in the nature of summary proceedings in equity. This clause refers to matters and proceedings in bankruptcy, as the successive steps to be taken in the progress of the application according to the directions of the act, over all which it gives plenary jurisdiction to be exercised as in analogous proceedings in equity, yet it does not give jurisdiction over all persons and things which may be affected by their proceedings in bankruptcy—as appears by the next clause:

2. "And the jurisdiction hereby conferred on the district court, shall extend to all cases and controversies in bankruptcy, arising between the bankrupt, and any creditor or creditors, who shall claim any debt or demand under the bankruptcy"—2. "To all cases and controversies between such creditor or creditors and the assignee of the estate, whether in office or removed." 3. "To all cases and controversies between such assignee and the bankrupt." 4. "And to all acts, matters, and things to be done under and in virtue of the bankruptcy, until the final distribution and settlement of the estate of the bankrupt, and the close of the proceedings in bankruptcy." 5. "To compel obedience to all orders and decrees passed by them in bankruptcy, by process of contempt and other remedial process, to the same extent (that) the circuit courts may award, in any suit pending therein in equity." This enumeration of the specified cases and controversies wherein jurisdiction is given to the district court, necessarily excludes all others which come within neither class, otherwise this specification is utterly useless; so taking it, as a settled rule in construing laws, the present case being a controversy between a petitioner for the benefit of the act, and a creditor by judgment and execution before a decree, who claims or demands nothing under or in virtue of the bankruptcy, the court has no jurisdiction over him. Nor would they have any if an assignee had been appointed, for the controversy in either case would not be between the bankrupt and creditor claiming under the bankruptcy, or between the assignee and such creditor; for here the creditors claim adversely and paramount to the bankruptcy—not under the bankrupt act, but by their rights at common law and the law of this state. Still less are the proceedings in a state court to recover a debt by its process, either a matter, a proceeding in bankruptcy, or an act, matter, or thing to be done under and in virtue of bankruptcy. On the present motion the controversy is between a petitioner, and execution creditors, whether the latter shall be deprived of the fruits of their judgment, execution, and levy, and be compelled to claim their debt under the bankruptcy. After a decree, the controversy would be between the assignee and such creditors, who was no party before the district court, and had never in any manner submitted to its jurisdiction, by proving his debt or otherwise. Now if between such parties there can be said to be a case, a controversy, or proceeding in bankruptcy, the district court can take jurisdiction, exercise it by an order and decree, and enforce it by the same process as a circuit court can do in a case in equity; but as this is the extent to which a district court can go, they cannot enforce their orders or de-

crees by any process which is forbidden to the circuit court. That court is prohibited by the act of 1793, from granting an injunction to stay proceedings in any court of a state, and should it do so regardless of the prohibition, it would require no small degree of judicial hardihood, to attempt to enforce it by attachment against the plaintiff, the constable, the sheriff, the magistrate, the judge, or the court, who taking their position on the act of congress, would disobey the order. This reference to the power of the circuit court, is conclusive to show the meaning of the law to be, that the district court can make only such orders and decrees in bankruptcy as they may enforce by the legitimate process of a court having jurisdiction of cases in equity, and on parties within their jurisdiction. If the court has no jurisdiction, their orders or decrees are mere nullities. If this motion should be made in a suit in equity in this court, on the clearest case for an injunction according to the settled rules of courts of equity, the act of congress presents an insuperable bar to an injunction, unless there can be found in the bankrupt act, some provision which authorizes a district judge, to do what the supreme court or any circuit court cannot do, and that too without any appeal from his decision. There is not a word in the sixth section which can be tortured into such a grant of power without a gratuitous interpolation, against all sound rules of interpreting statutes, which prescribe rules of action by courts. In this case too, there is a want of jurisdiction in the district court, over the persons of the plaintiffs in the judgments, or the subject matter in controversy; creditors who stand aloof from all proceedings in bankruptcy, and make no claim under it, are not embraced by this section, it is confined to those who claim under the bankruptcy. The subject of the controversy is the right of property, acquired by legal process in state courts before a decree or the appointment of an assignee presenting the question, whether after a levy, it shall be held under a lien valid by the laws of this state, or surrendered to a receiver to be appointed by the district court. No provision is made for such a case, as that of a defendant in an execution contesting the right of the sheriff or plaintiff to property levied on by a summary order of a court other than that by whose process and officers the levy has been made; but there is in the eighth section a provision for such a case after decree and the appointment of an assignee which is the following:

"That the circuit court within and for the district wherein decree of bankruptcy is passed, shall have concurrent jurisdiction with the district court of the same district— of all suits at law and in equity, which may and shall be brought by any assignee of the bankrupt, against any person or persons claiming an adverse interest, or by such person against such assignee, touching any property or rights of property transferable to or vested in such assignee." Such suits are limited to two years from the decree on or after the cause of action accrued. This section embraces cases to which the sixth does not extend: it discriminates between proceedings in bankruptcy, and suits at law or in equity, and would meet the case before us, if the assignee was a party plaintiff or defendant: and a final judgment or decree would be examinable by an appeal or writ of error under the general provisions of the judiciary act. When we thus find that a controversy between the bankrupt and a creditor before a decree, is neither within the jurisdiction of the district court under the sixth, nor that of the circuit court under the eighth section, it is most manifest, that the parties are left in the same position in which they stood in the state court. On the appointment of an assignee, he can contest the rights of an execution creditor, or any other person who claims an adverse interest in the property of the bankrupt by a lien or purchase—but the bankrupt cannot be an actor. The provision of the eighth section is most wise and just; it puts cases at law and in equity as therein defined, (though between citizens of the same state,) on the same footing as patent and other cases arising under the laws of the United States; it submits rights of property to the decision of courts from whose final decree or judgment there may be a resort to an appellate court, and does not leave the rights of purchasers and creditors dependent on the summary order of a single judge, which is final and without revision. There can be no case which more strongly illustrates the sound policy of the law than this, for if an injunction can be granted by the district judge, to stay proceedings before a justice of the peace or an inferior court, to take property under a levy from a constable or sheriff, and deliver it over to a receiver, the same high power would be equally capable of exercise on the process of this court, or the supreme court of the state. Such a power is unwarranted by any law, and the opinion of this court will be certified accordingly to the district court.

NOTE [from 1 Pa. Law J. 302]. It will be seen, further on, that the court, in this case, decides all these points against the counsel who relied on [Ex parte Foster, Case No. 4,960] the cited decision of Judge Story; and as that decision has been considered as disturbing the security of judicial liens, it is necessary, in order to understand a portion of Judge Baldwin's opinion, to present an abstract of what has been decided and said in the case referred to. The case was this: Certain attachments on mesne process under the laws of Massachusetts, had issued against the property of Foster, who, after the issuing of the attachments, filed his petition in bankruptcy, and within six days afterwards, (and of course before the decree in bankruptcy) applied to the district judge for an injunction "against said attaching creditors, enjoining them from further proceeding against said property, &c., and requiring them to surrender the same to such assignee, as may be

appointed by this court," &c. An injunction was granted, restraining the proceeding until the final event of the proceedings in bankruptcy; and the judge says that if a decree is obtained, it will prove a bar to further prosecution of the suit. The points decided were, accordingly, that the district court had power to issue an injunction; and 2d, that an attachment under the Massachusetts attachment law was not a lien within the saving in section second of the bankrupt law. "The act of congress," says Judge Story, "for wise purposes, has conferred a more wide and liberal jurisdiction upon the courts of the United States, than the lord chancellor, sitting in bankruptcy, was authorized to exercise. In short, whatever he might properly do, sitting in bankruptcy, or sitting in the court of chancery, under his general equity jurisdiction, the courts of the United States are by the act of 1841, competent to do." "Nothing in this act contained shall be construed to annul, destroy, or impair, &c., any liens, mortgages, or other securities on property real or personal, which may be valid by the laws of the states respectively," &c. The last point depended, therefore, on the nature of this local-law attachment—a matter about which, of course, the profession out of Massachusetts is not so accurately informed. It cannot be disguised, however, that even from the authorities cited by Judge Story, this process appears to resemble very closely, what we, familiarly, call a lien, or at any rate, a "security." It resembles very much our foreign attachment lien. Thus, the sheriff takes possession of the chattels attached, which are "held as security to satisfy such judgment as the plaintiff may recover" (Rev. St. Mass. 1836, c. 90, §§ 23, 24, as quoted by Judge Story; and in commenting upon the argument of counsel, who went so far as to contend that an attachment was "a perfect, fixed, and vested lien," and gave "a vested interest," &c., in the estate attached, the judge admits that one of the authorities which he is "unable exactly to comprehend," (but to which he bows as a decision upon the local law, binding on the court) does sustain that position. His honor thinks, however, that another case (Atlas Bank v. Nahant Bank, 23 Pick. 488) shows that if such an attachment be a lien, it is not such a one as is saved by section second of the act. With great respect for the learned judge, it is thought that it could be shown that the latter decision does not overrule the former, and is not an authority for the position to which it is extended by the judge. However, if, as has been already said, the decision in Foster's Case is made on the mere ground of the peculiar nature of the Massachusetts process—and because it is unlike the lien of a judgment or execution as commonly recognized—the decision was of course, improperly pressed upon the court for this circuit, as deciding the principal case; and some portion of the court's commentary on the decision proceeds on a misapprehension of what Judge Story meant to say. While, however, Mr. Justice Story, does say, in one place, that "the case of an attaching creditor is not near so strong as that of a judgment creditor who has obtained a fi. fa. under which the sheriff has actually seized, &c.," he says in another place, "in truth, it bears a closer resemblance to the lien created by a judgment upon the real estate of the debtor," and then says, "yet a judgment creates no interest in the land," and cites Conard v. Atlantic Ins. Co., 1 Pet. [26 U. S.] 386, to sustain this doctrine. Admitting the resemblance to a lien of a judgment, the argument of the judge, appears to be, that by a judgment against real property, or by a levy on personal property, the general property of the debtor is not divested—that these remedies are not strict common law liens, i. e. liens where the claimant has actual possession of the property—in other words, that they do not constitute a property, or right in the very substance of the thing, but are merely rights to

be paid out of the property before any subsequent incumbrances; or what, in common parlance Pennsylvanians call "liens." These points, (as to the first of which, it is believed there never has been any doubt,) being established, the judge proceeds to consider the second section of the bankrupt law, and says, "Now, certainly, the natural interpretation of these words 'liens, mortgages, and other securities on property real or personal,' would seem to be, that they referred to things of a like nature; or, as the maxim of the law is, each may be known from its associates. 'Nascitum a sociis.' The words may be all perfectly satisfied by treating them as referring to liens fixed and vested in the party by a consummate title, such as 'liens by contract, resting on possession or absolute by law such as pledges,' and not merely inchoate and conditional liens dependent on a mere remedial process. The term 'securities,' follows 'mortgages,' which are clearly vested rights under grant of the party, defeasible only upon a future fulfilment of some condition subsequent. * * * If we look back to the enacting clause of this same section to which the saving is appended as a proviso, we shall see that there, the enumeration is confined to 'securities, conveyances, or transfers of property or agreements made or given,' &c. * * * Now the natural inference certainly would seem to be, that the proviso is carved out of the enacting clause; and saves things ejusdem generis." Such language as this would seem to indicate what it has been regarded as declaring, that even judgments and executions before a sale, are not within the proviso; and as the attachment of Foster's goods was before even the petition filed, a discharge would divest judgments of any date.

Judge Story, it is true, says in one place: "The moment that the decree in bankruptcy is passed, it relates back for all purposes of the act, to the time of the petition; and as soon as the assignee is appointed, all the rights, titles, powers of authority of the bankrupt vest in him by relation from the said period." As however the attachment in Foster's Case, issued before the filing of the petition, the decision cannot be carried on the back of this doctrine; and if followed to results divests the lien, no matter when obtained. It is true, indeed, that this general language of the learned judge is found in company with other expressions that would perhaps render it unsafe to say that he means all that is indicated by the general language cited. Taken in connection, however, with the disregard with which the court treats the attachment, it may be thought to justify in some extent, the surprise which has been expressed. Judge Story goes on afterwards, indeed, to decide the case on what he regards as another ground—viz. that the attachment being a merely conditional lien dependent for final effect on the result of the suit, if the bankrupt obtains a discharge, the debt will be discharged likewise, and this discharge would be pleadable in bar to the attachment suit, as a plea puis darrein continuance. But does not this fact depend exactly upon the former question, i. e. whether the attachment is a "lien" as "other security," for if it be, then by the language of the proviso in section 2d, the discharge cannot in any way, "annul, destroy, or impair it."

The reporter begs, however, to refer the reader to the case itself; which, appearing to him to deal in vague, and not always consistent language, he finds himself unable, precisely to present. While as he has said, its language, in places, is, certainly, unprecise, he himself considers the decision rather as an attempt to abrogate in a particular instance, and in favour of the equitable provisions of the bankrupt law, the effect of the Massachusetts attachment process; and that to justify this, the learned judge has been urged into doctrines which are not law; and of which in fairer cases he would be the last person to make a practical application.

The court, in this circuit, as has been said, considers the case as more dangerous, and as going further.